IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:24-cr-165 (MSN) |
| ABIODUN OGUNWALE, | |
| And | |
| ABIMBOLA AJAYI, | |
| Defendants. | |

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION FOR A NEW TRIAL

The United States of America, by and through its undersigned counsel, responds in opposition to the defendants' motion for a new trial. For the reasons discussed below, this motion is without merit and should be denied.

**Procedural Summary**

On September 26, 2024, a grand jury sitting in Alexandria returned a five-count indictment charging Abiodun Ogunwale ("defendant Ogunwale") and Abimbola Ajayi ("defendant Ajayi") with various crimes related to their efforts to defraud and embezzle from The Non-Profit. The indictment charged the defendants with one count of conspiracy to commit wire and mail fraud in violation of 18 U.S.C. § 1349; two counts of wire fraud in violation of 18 U.S.C. § 1343; and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). Defendant Ogunwale was also charged with one count of mail fraud in violation of 18 U.S.C. § 1341. A grand jury returned a superseding indictment on February 5, 2025, but the defendants were still charged

1

with the same offenses described above. Before trial started, the government dismissed the wire fraud counts charged in the superseding indictment (Counts One and Two).

The parties engaged in vigorous rounds of pretrial motion practice and litigated various issues including the issuance of Rule 17 subpoenas, whether to sever the defendants' trials and the defendants' expert notice, among other subjects.

The trial in the instant case commenced on May 12, 2025 and lasted for four days. At trial, the United States presented the testimony of ten witnesses, including seven of The Non-Profit's employees and former employees, a Postal employee, a witness from PayPal and testimony from Special Agent Hemberg. The government called The Non-Profit witnesses to authenticate records, to testify as to their first-hand knowledge of the defendants and regarding defendant Ogunwale's computer. The PayPal witness testified as to the PayPal records explaining how they worked and what various documents meant. Special Agent Hemberg testified at the end of trial. He testified as to interviewing defendant Ajayi, emails found through the execution of search warrants, explained financial transactions conducted by the defendants.

In addition to this testimony, the government also introduced hundreds of exhibits including, but not limited to, highly incriminating bank records, emails, invoices, and PayPal transactions used in the scheme to defraud The Non-Profit and launder the defendants' proceeds.

The defendants also presented a robust defense. Defendant Ogunwale called one witness, Dayo Fasola. The defendants also submitted multiple exhibits into evidence including a summary chart.

After listening attentively to witness testimony and viewing exhibits on courtroom screens during the trial, the jury convicted the defendants of all the remaining charges. Specifically, both

2

defendants were convicted of conspiracy to commit wire and mail fraud and conspiracy to commit money laundering. Defendant Ogunwale was also convicted of mail fraud. On July 11, 2025, defendant filed the instant post-trial motion and corresponding memorandum in support of the motion. ECF 190. As discussed below, defendant's motion has no factual or legal basis and should be denied.

Over the course of four days, this Court presided over a full and fair trial of the allegations in this case. The jury heard evidence from multiple witnesses and saw hundreds of exhibits. The government proved the allegations in the superseding indictment with overwhelming evidence. The defendants are not entitled to a new trial because they disagree with the jury's verdict which is supported by a mountain of evidence. Accordingly, the government respectfully submits that the defendants' post-trial motion should be denied.

### Legal Standard

The burden of justifying a new trial rests with the defendant. *United States v. Geders*, 624 F.2d 3l, 33 (5th Cir. l980). The decision to grant a new trial lies within the sound discretion of the trial court and will be reversed only for an abuse of that discretion. *United States v. Arrington*, 757 F.2d l484, l486 (4th Cir. l985); *United States v. Williams,* 6l3 F.2d 573, 575 (5th Cir. 1980); *United States v. Gibson*, 559 F.2d 934 (4th Cir. 1977). The Court may grant a defendant's motion for a new trial only if the Court determines that "the interest of justice . . . requires" the Court to vacate the jury's considered verdict. Fed. R. Crim. P. 33(a). "[T]he standard for jettisoning a jury verdict in favor of a new trial remains demanding, and courts must exercise their discretion to do so sparingly." *United States v. Rafiekian*, 991, F.3d 529, 549 (4th Cir. 2021) (reversing district court's conditional grant of a new trial); *see also United States v. Chom Lam*, 677 F.3d 190, 203 (4th Cir.

2012) ("a court "should exercise its discretion to grant a new trial sparingly."). "[A] jury verdict is not to be overturned except in the rare circumstance when the evidence weighs heavily against it." *United States v. Burfoot*, 899 F.3d 326, 340 (4th Cir. 2018). Indeed, granting a new trial is a drastic remedy intended for the rare case. *See United States v. Chin*, 1999 WL 333137, 181 F.3d 92, at *1 (4th Cir. May 26, 1999) (unpublished). Applying this standard, defendants' motion must fail.

**Argument**

The defendants have not identified a single error or set of errors that would merit granting a new trial in this case, and the motion should be denied. With respect to each of the reasons for a new trial urged by the defendants, no authority has been cited which suggests that a new trial is in order. Instead, the defendants' motion mainly consists of relitigating their old motions which were correctly denied by the Court before trial. Additionally, no showing has been made that the defendants were actually prejudiced by any errors or that a new trial would result in a contrary result.

### I.    The District Court Reasonably Denied the Defendants Request for a Continuance as the Trial had been Pending for Multiple Months.

The district court was within its sound discretion to deny the defendants' motions for a continuance. *See United States v. LaRouche*, 896 F.2d 815, 824 (4th Cir. 1990) (citing *United States v. Hutchison*, 352 F.2d 404, 405 (4th Cir. 1965) (granting continuance within sound discretion of trial judge; reasonable latitude must be allowed). The defendants were first indicted in September 2024. Trial was originally set in March 2025. After a grand jury returned a superseding indictment on February 5, 2025, trial was continued until May 12, 2025, approximately 96 days later. The superseding indictment did not add any new substantive counts

to the charging document but rather streamlined the government's theory of proof for the pending trial. The financial transactions at issue did not change from the initial indictment in September. Although not required, government shared a compare document showing the changes between the superseding indictment and the original indictment with the Court and defense counsel. *See* Exhibit A (compare document showing the changes between the indictment and superseding indictment). Due to the nature of the indictment's changes, it is questionable whether a continuance was even necessary after the superseding indictment. Nevertheless, the defense had several months to adapt to the superseding indictment and prepare for trial. *See Badwan v. United States*, 624 F.2d 1228 (4th Cir. 1980), *cert. denied*, 449 U.S. 1124 (1981) (Fourth Circuit affirmed trial court's denial of a continuance when the defense counsel was retained less than a month before trial in an "exceedingly complex and document-intensive" case and argued that he was not adequately prepared for trial.) Tellingly, the defendants have not identified any specific errors made by trial counsel due to their lack of preparation time before trial. *LaRoche*, 896 F.2d at 825 (citing *United States v. Cronic*, 466 U.S. 648 (1984)). Thus, the argument that the defendants were unfairly rushed to trial must fail.

## II.     Defendant was not entitled to the requested documents in discovery and never met his burden under Rule 17.

The defendants regurgitate several of the same arguments drawn from defendant Ogunwale's previously denied motions for Rule 17 subpoenas to argue that certain documents from The Non-Profit – namely other invoices not deemed to be fraudulent– would have been helpful at trial. *See* ECF 30 67, 70, 84, and 85. Thus, the United States reincorporates its response to these requests that were filed on March 17, 2025 (ECF 75) and May 6, 2025 (ECF 136). Specifically, as to other non-fraudulent invoices, the United States previously argued, and the court

5

agreed, whether or not other contractors performed their invoiced work was irrelevant to the particular fraud scheme alleged in the superseding indictment and improper good character evidence. ECF 75 at 6; ECF 136 at 2-4; ECF 111 at 2-5.

The defendants argue that the Court denied them the opportunity to obtain multiple documents from The Non-Profit that would have been helpful to their defense. However, criminal defendants do not have a general right to discovery, absent a statute, rule of criminal procedure or some other entitlement. *United States v. Palacios*, 677 F.3d 234, 246 (4th Cir. 2012). The defendants would only able to secure the requested documents through Rule 16, *Brady*, or Rule 17 subpoena disclosures. As the discussion below will show, the defendants were not entitled to receive the requested documents through Rule 16, *Brady*, or Rule 17 subpoena disclosures.

The court correctly denied defendant Ogunwale's multiple subpoena requests because he never met his burden to secure a Rule 17 subpoena. Whether a document is helpful to the defense is not the standard for securing documents through a Rule 17 subpoena. Instead, **the moving party,** in this case the defendants, must show that the documents being sought are:

> (1) That the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay trial; and (4) that the application is made in good faith and is intended as a general "fishing expedition."

*United States v. Nixon*, 418 U.S. 683, 699-700 (1974) (footnote omitted) (emphasis added). It is the defendant's burden – not the government's burden – to prove that he satisfied the *Nixon* standard. The defense never met their burden, despite having multiple opportunities to do so before trial. As such, the district court did not err, much less abuse its discretion in denying these requests. *See United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010) ("The district court denied Caro's

motion for Rule 17(c) subpoenas . . . this was not an abuse of discretion.")

The defendants also recycle the baseless argument that The Non-Profit did not comply with the Rule 17 subpoena issued by this Court. *See* ECF 190 at 6-7. As the United States has previously argued, the Rule 17 subpoena only instructed The Non-Profit to provide proposal documents. *See* ECF 85. The subpoena never ordered The Non-Profit to produce prepositioning or capture documents. This is in part because defendant Ogunwale *choose* not to request prepositioning records in his Second Request for a Rule 17 Subpoena. ECF 136 at 4. The Non-Profit complied with the Rule 17 subpoena and explained to defense counsel what searches were undertaken to locate the requested documents. *See* Exhibit B (letters from The Non-Profit's counsel to defendant Ogunwale's trial counsel). Furthermore, as part of its Rule 17 subpoena production, The Non-Profit informed the defense that it did not always keep every proposal and that proposals were not created for every funding opportunity that The Non-Profit pursued or attempted to pursue. *See id.*

The fuller context of the case shows how the defendants misconstrue the witnesses' testimony within their motion. Steve Neri's statement that he could locate prepositioning documents is irrelevant *as The Non-Profit was not ordered to produce these documents. See* ECF 85 (Rule 17 subpoena).[1] Similarly, the fact that Laura Brye was able to locate proposals on a

---

[1] The government also notes once again that defendant Ogunwale was the individual responsible for maintaining the Business Development department's records. He is most likely the party to blame for the recordkeeping failures The Non-Profit's Business Development department specific documents that were created during his tenure, such as various prepositioning documents. As to the argument that The Non-Profit did not keep critical records from defendant Ogunwale's filing cabinet – the government already admitted that it mistaken referred to the wrong filing cabinet in an earlier pleading. However, it appears that defendant Ogunwale himself cleared out his office before The Non-Profit moved out of the Millwood facility. Thus, defendant Ogunwale also presumably cleaned out the filing cabinet in question. *See* Ex. H (email about Ogunwale clearing out his office). Any error regarding files not maintained by The Non-Profit from defendant Ogunwale's old Millwood office, should be viewed as invited error by the defense.

7

shared drive does not contradict The Non-Profit's assertion that its business practice was to keep certain proposals and supporting documents based on some circumstances and not keep certain proposals or supporting documents based on other circumstances. Organizations have many valid business reasons for choosing to keep some documents while not retaining other documents. Furthermore, Ms. Brye's testimony also alluded to the fact that The Non-Profit did not always keep all the proposals it worked on as a subrecipient.

Q (by Attorney Leibig): To your knowledge, does [The Non-Profit] have or keep the proposals for which they were only the subrecipient?

A: Most of the time, we did.

Trial Tr. Vol. 2B (May 13, 2025) at 155:9-11.

Ms. Brye similarly testified later that "we kept copies of the proposal if we were allowed to by – if we were a sub." Trial Tr. Vol. 2B (May 13, 2025) at 161:1-2. Again, that testimony is in line with the language of the stipulation that states that The Non-Profit did not necessarily maintain all of the copies of its proposals. *See* Exhibit C. Similarly, Ms. Brye's testimony regarding the search for the proposals shows that she was acting at the request of The Non-Profit's counsel and diligently conducting the search required by the Rule 17 subpoena. Ms. Brye's testimony also shows that she shared her results with The Non-Profit's counsel who in turn shared them with the government and defense counsel. *See id.* at 159-162:2.[2]

---

[2] These questions by the defense also inappropriately verged into The Non-Profit's counsel's directions to The Non-Profit employees, including Ms. Brye, and their response to the Rule 17 subpoena, which is protected by attorney-client privilege. Undersigned counsel understands that The Non-Profit does not wish to waive attorney-client privilege on this subject, or any other.

The defendants are also not entitled to these documents pursuant to Rule 16 or *Brady* as the government previously argued and reincorporates those arguments here. *See* ECF 75 at 2-3. The information was simply not within the government's possession as required under both obligations and the government reincorporates its earlier arguments here. The government disclosed all of the proposals, invoices, and prepositioning documents that it received from The Non-Profit to the defense through discovery. Moreover, because the defense "can only speculate as to what the requested information might reveal, [they] cannot satisfy *Brady's* requirement of showing that the requested evidence would be 'favorable to the [the] accused.'" *Caro*, 497 F.3d at 619 (internal citations omitted); *see also United States v. Agurs*, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.")

To be clear, the United States did not give guidance to The Non-Profit as to how to comply with the subpoena, only that they should fully comply.

The Court properly denied defense's previous Rule 17 subpoena requests as they never met their burden. The defendants were not entitled to receive the requested documents.

### III.    The Stipulations do not Serve as a Reason to Grant a New Trial as the Government worked in Good Faith with the Defense Regarding the Stipulations.

The defense now argues that the stipulation that they sought for the government to enter as to The Non-Profit was false. The stipulation read:

> The undersigned parties agree that in its regular course of business, The Non-Profit kept the final versions of proposals for opportunities in which they were the primary applicant for the funding opportunity. The Non-Profit did not necessarily receive copies of the final technical or cost proposal when it was a proposed subrecipient as the primary applicant ultimately decided whether to share the final proposals. The Non-Profit also did not necessarily maintain final versions of proposals where

9

> The Non-Profit may have explored participation but did not advance to the stage of submitting a final proposal.

*See* Exhibit C. As the defense sought this particular stipulation, any error that resulted from this stipulation was arguably invited error by the defense. "A court cannot be asked by counsel to take a step in a case and later be convicted of error, because it complied with such request" under the invited error doctrine. *United States v. Naum*, 134 F.4th 234, 239 (4th Cir. 2025) (quoting *United States v. Herrera*, 23 F.3d 74, 75 (4th Cir. 1994)). As the defense requested the stipulation, they invited any error that may exist in the stipulation and should not be permitted to challenge them now. Thus, the Court may apply the invited error doctrine and quickly resolve this issue.

In the alternative that the Court does not wish to apply the invited error doctrine, it should be noted that the stipulation was written to reflect the parties' agreement that The Non-Profit did not *necessarily* maintain all proposals it worked on. As defined by Merriam-Webster's Dictionary defines, "not necessarily" means possibly but not certainly and is used to say that something is not definitively true. *See* Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/not%20necessarily, last accessed July 24, 2025. The plain language of the stipulation did clearly not foreclose the possibility that The Non-Profit *did* maintain some copies of proposals where it served as a subrecipient or other proposals that The Non-Profit did not submit a final proposal.[3]

Defense counsel Leibig and undersigned counsel exchanged numerous drafts of the stipulation before settling on the final language that was read before the jury at trial. The Non-

---

[3] The government has shared all proposals that it received from The Non-Profit with the defense. Undersigned counsel is unaware of any other documents that would have been responsive to the Rule 17 subpoena that The Non-Profit chose not to share with either the government or defense.

10

Profit's general counsel informed both parties about The Non-Profit's recordkeeping practices. *See* Ex. A. The government, and presumably the defense, relied on these representations by the general counsel – who is undoubtedly in a better position to explain the nuances of The Non-Profit's recordkeeping practices (and has access to the actual records in question when delivering her answer) than a witness who is answering an unclear question by defense counsel in the middle of cross-examination. In fact, the parties ultimately agreed to the language in Exhibit C because it tracked the language that The Non-Profit used in its letters to describe its record keeping process for the proposals. *See* Ex. B. If defense counsel had any reservations regarding the stipulation he should have asked as the drafting process was certainly a collaborative effort between the parties.

Ms. Brye did testify that to her knowledge that all the proposals were kept on The Non-Profit's G drive. *See* Trial Tr. Vol. 2B (May 13, 2025) at 154:20. However, this testimony is in response to an unclear line of questioning from the defense counsel, who had previously asked Ms. Brye about all of the proposals that she had worked on. It is unclear whether Attorney Liebig is asking whether all the proposals that she had worked on were on the G drive or whether the whole universe of The Non-Profit's proposals were on the G drive. Thus, Ms. Brye's testimony does not necessarily conflict with the language of the stipulation as all the proposals that she herself worked on may have been maintained by The Non-Profit and given to the defendant. Similarly, Ms. Brye may have been confused by the ambiguous question and mistakenly provided an incorrect answer about the existence of the proposal. Moreover, Ms. Brye testified to the best of her knowledge at the time. Ms. Brye's knowledge was also understandably limited by the fact that she did not have her computer in front of her and was not able to confirm that all of these proposals were in fact maintained.

The defendants next assert the government attempted to have the parties agree to a false stipulation regarding the path of the wires charged in Counts One and Two. The government agrees that it could not definitively prove the wires charged in Counts One and Two traveled through the Eastern District of Virginia. That is why the government voluntarily dismissed these counts before trial. However, the defense's allegation that the government hid this information from the defense is false. Until a couple of days before trial, the government believed that the charged wires had traveled through the Eastern District of Virginia. Before indicting the case, the earlier prosecutor had subpoenaed the financial institution regarding the path of travel of the wires and obtained a declaration stating that: "In June 2020, the financial institution processed ATM cash deposit transactions through servers located in Oregon and Virginia." *See* Exhibit D. This declaration was produced to the defense in the initial discovery production. Prosecutors and Agent Hemberg relied on this declaration in good faith when seeking the indictment and superseding indictment against the defendants. Furthermore, the backs of the ATM tickets were also stamped "Richmond, Virginia." *See* Exhibit E.

The government made diligent and repeated efforts to meet with the financial institution witness several weeks before trial to confirm this information. However, the financial institution did not identify a specific witness until the week before trial. As such, a pre-trial meeting was not scheduled until very close to trial. Indeed, the government finally met with the prospective witness on the afternoon of Thursday, May 8, 2025. During that meeting, the witness told the government that the financial institution processed ATM cash deposits transactions through servers located in either Oregon or Virginia at the relevant time, not both Oregon and Virginia. He also shared that he was unable to tell which of the two servers, the Oregon or Virginia server, processed the wires

12

charged in Counts One and Two. That same day, the government emailed defense counsel "we met with the [the financial institution] representative today. We learned that the witness is unable to determine whether the wires charged in Count 1 and Count 2 definitively traveled through a server located in Richmond, Virginia or another [financial institution] server." *See* Exhibit F. The government then dismissed Counts One and Two shortly before trial started – which was the best outcome for the defense for these charges. Thus, the defense's allegation that the government knowingly tried to have the defense enter a false stipulation is incorrect. The defense knew about the disconnect between the Agent Hemberg's grand jury testimony about the path of the wires and the information that prosecutors shared about the server before trial started. Defense counsel had the opportunity to cross-examine Agent Hemberg regarding this subject matter, but chose not ask Agent Hemberg about this disconnect when he testified. The government clearly worked with the defense in good faith in crafting the stipulations and only factually accurate stipulations were entered by the parties at trial. This is not a basis for a new trial.

### IV.    Defendant Ogunwale's Request to Travel to Nigeria was Properly Denied.

During pretrial motions the defense argued that Mr. Ogunwale needed to travel to Nigeria to "gather evidence for the defense" including bank records. *See* ECF 61 and 68. The defense now argues the Court incorrectly denied these requests. However, the merits of these requests were litigated before trial and the Court acted well within in its authority to correctly deny defendant Ogunwale's motion to travel to Nigeria. The government incorporates its previous responses to the defendants' pretrial travel requests here. *See* ECF 74.

As the Court is well aware, the Bail Reform Act of 1984 requires the court to order the pretrial release of a defendant on bail "subject to the least restrictive further condition, or

combination of conditions, that [the court] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B); *see also United States v. Salerno*, 481 U.S. 739 (1987). It has long been established that constraints that are reasonably designed to ensure a defendant's presence at trial may be imposed on the defendant. *See Bell v. Wolfish*, 441 U.S. 520, 534 (1979). The defendant was released on bond while awaiting trial with a few pretrial bond conditions, including the conditions that his international travel must be approved by the Court and that his passport remain in his counsel's possession. To allow the defendant to travel to Nigeria approximately two months before his trial was scheduled to start would have impinged on the United States' interest in ensuring the defendant's presence at trial. The defendant summarily states that "he needed to speak to those on the ground who could explain the nature of pre-positioning work, and he needed to collect records from financial institutions, neither of which could be done remotely or through private investigators." *See* ECF 190 at 10. However, the defendant never explained in either his earlier filings or this motion why remote contact or the use of a third-party was insufficient. After all, most banks, including Access Bank – a popular Nigerian bank – use online banking. *See* Exhibit G (screenshot of Access Bank's homepage which links to "Online Banking.") Furthermore, the defendants were initially indicted in September 2024. If they needed time to track down specific financial information, they had significant time to do so prior to trial. Their failure to wait until the eve of trial falls squarely upon their shoulders. Thus, the Court's denial of defendant Ogunwale's travel requests were correct.

**V.    The Court Correctly Excluded the Defense's Unqualified Expert from Testifying After the Defense Provided Late and Insufficient Notice of Dayo Fasola's Proposed Expert Testimony.**

The defense also reasserts its old argument that defendant Ogunwale's witness, Dayo Fasola, should have been allowed to testify as an expert. The Court did not err, much less abuse its discretion, in refusing to allow Dayo Fasola to testify as an expert witness. The defense's expert notice was both late and insufficient. Under the Court's scheduling order, the parties were directed to provide expert notices at least fifteen business days before trial. In addition to the Court's scheduling order, both parties' expert disclosure obligations are governed by Rule 16. Pursuant to Rule 16, expert disclosures are also required to have (1) "a complete statement of all opinions that the defendant will elicit form the witness in the defendant's case-in-chief;" (2) the bases and reasons for the opinions; (3) the witness's qualifications including publications that witness authored; and (4) all other cases which the witness testified as an expert at trial or by deposition in the past four years.

The defense provided notice of their proposed expert on May 5, 2025, only a week before trial started on May 12, 2025. This notice was late under the terms of the Court's scheduling order. The expert notice provided few details and only cited to Ms. Fasola's affidavit as evidence of her bases and reasons for her expert testimony. The government objected to this late and deficient expert notice. *See* ECF 137. The government reincorporates the arguments it previously raised in ECF 115 and 137 here. Of note, the government reiterated that allowing Ms. Fasola to testify as an expert would have been substantially prejudicial to the government as it would not have had time to Daubert her effectively and assess whether her testimony was permissible under Rule 702. The Court acknowledged that this expert notice was late and ultimately ruled that Ms. Fasola was

15

allowed to testify as to her personal knowledge about certain financial transactions she conducted on behalf of defendant Ogunwale or defendant Ajayi but that she would not be allowed to testify as an expert.

In the Fourth Circuit, a district court's ruling to exclude an expert witness based on the timeliness or adequacy of the expert notice is reviewed on an abuse of discretion standard. *United States v. Holmes*, 670 F.3d 586, 598 (4th Cir. 2012); *see also United States v. Barile*, 286 F.3d 749, 758 (4th Cir. 2002) (no abuse of discretion in excluding expert testimony where defendant failed to comply with Rule 16's notice requirements). "[T]he case law is clear that it is not an abuse for a trial court to disallow expert testimony where a late proffer of evidence by the defense substantially prejudice the government in its ability to find its own expert and conduct similar testing." *United States v. Dorsey*, 45 F.3d 809, 816 (4th Cir. 1995); *see also United States v. Reeves*, 2:18-cr-291, 2019 WL 5268637 at *3 (S.D.W.V. Oct. 17, 2019) (excluding the government's expert witness from testifying when the government provided notice of its expert six days before trial). Furthermore, the defense's expert designation was inadequate in explaining the bases and reasons for Ms. Fasola's proffered expert testimony. The affidavit mainly details her personal transactions conducted on behalf of defendant Ogunwale instead of providing reasons and bases for her proffered opinions. *See Holmes*, 670 F.3d at 597. Furthermore, for reasons previously raised by the government's filing ECF 137 and reincorporated here, Ms. Fasola was unqualified to testify as an expert. Thus, the Court acted well within its discretion to exclude the defense's proposed expert witness when defendant Ogunwale filed his expert notice late and failed to meet Rule 16's other disclosure requirements. The prejudice that the defendants suffered from

this exclusion – if any – is severely mitigated by the fact that Ms. Fasola testified as a lay witness for the defense.

Additionally, Ms. Fasola's understanding of what a particular transaction was for versus the fact that it occurred, was properly limited by the court as hearsay. *See* Fed. R. Evid. 801(c). Ms. Fasola testified that she had first-hand knowledge that transactions occurred, but why they occurred would have only been based on her speculation or what another individual had told her, which would be an out of court statement being offered for the truth of the matter. *See* Trial Tr. Vol. 4A (May 14, 2025) at 39-40, 46-47, 49. The court properly limited her testimony to her actual knowledge. The court is not required to admit inadmissible evidence because the defense thinks it is the best means for them to present their case.

The Court properly excluded the defense's proposed expert. Not only was Ms. Fasola unqualified to testify as an expert but, the defense had provided a late and insufficient expert notice for her proposed expert testimony.

## VI.     The Government Presented Strong Evidence that was Not Unfairly Prejudicial Against Defendant Ajayi.

Defendant argues that the government presented inadmissible and harmful evidence against her during the trial. The government not only disagrees with this argument but also notes that trial counsel did not object nor properly preserve his objection to the presentation of this evidence.[4]

---

[4] As the defense did not properly preserve his objection, any review of this error (if any exists) would be for plain error on direct appeal. *United States v. Said*, 26 F.4th 653, 660 (4th Cir. 2022). The Fourth Circuit has recognized that a post-trial motion does not preserve errors, and that "litigants may not attempt to blindside district courts by points out errors long after the opportunity to take immediate curative action has passed." *United States v. Smith*, 453 F.3d 323, 330 (4th Cir. 2006) (citing *United States v. Godwin*, 272 F.3d 659, 672 (4th Cir. 2001)).

17

Defendant Ajayi further argues that Agent Hemberg's committed perjury when he testified that:

> [W]e when [sic] to Ms. Ajayi's residence, knocked on her door. She answered. We identified ourselves, you know, which agency we were with. Indicated we needed to -- would like to speak with her about her previous work as a consultant with [The Non-Profit], and her initial response was, Oh, God.
>
> Q. And what happened next?
>
> A. She indicated that she had to go to work and; like, fine; we can reconnect later, and, you know, that was it.

In the Fourth Circuit, "[p]erjury involves the false testimony under oath regarding a material matter where the witness has a willful intent to deceive the fact finder. A defendant is not guilty of perjury if the false testimony resulted from confusion or mistake." *United States v. Sarihifard*, 155 F.3d 301, 306 (4th Cir. 1998) (internal citations omitted). In reaching the conclusion that Agent Hemberg presented perjured testimony, defendant Ajayi ignores the fact that Agent Hemberg's testimony was factually correct. Agent Hemberg described what was the end of that **particular** encounter with defendant Ajayi. Agent Hemberg's statement of "that was it" can mean either (1) the sum total of all of his interactions with defendant Ajayi, or more likely as indicated by the context here, (2) the end of that particular interaction with defendant Ajayi. Even if the Court does not view "that was it" as a factually accurate statement, it is unclear if Agent Hemberg was mistaken in answering the open-ended "what happened next" question as to what happened next in that particular interaction with defendant Ajayi or answering what happened next in the sum total of all of Agent Hemberg's interactions with defendant Ajayi. Both interpretations

---

As will be discussed further, defendant Ajayi has not met her burden to prevail on plain error review.

are reasonable responses to the question and any incorrect testimony by Agent Hemberg was driven by the fluid nature of the question. It is also unclear if this "misstatement" (again, assuming the Court would classify the testimony as a misstatement) was material. Even more importantly, there is no evidence Agent Hemberg willfully intended to deceive the jury with this statement. Thus, Agent Hemberg's testimony fails to meet the legal definition of perjury for multiple reasons.

Moreover, the following day, Agent Hemberg testified that he *did* meet with defendant Ajayi again. When AUSA Shartar asked if Agent Hemberg had any other interactions with defendant Ajayi, Agent Hemberg provided the following answer:

> A: Yes. So the morning that we made contact with her, [she] indicated that she had to get to work which is fine, that happens all the time. We agreed to meet later that afternoon back at her apartment and we subsequently met later that day.

Trial Tr. Vol. 4A (May 14, 2025) at 11:3-7. Several questions later, AUSA Shartar asked Agent Hemberg about his interview with defendant Ajayi.

> Q: And when you met with her later that afternoon, did she say anything else about [The Non-Profit?]
>
> A: Yes, she just confirmed that she previously worked with them as a consultant through 2020. She talked about her educational background a little bit.

Trial Tr. Vol. 4A (May 14, 2025) at 11:18-22. Thus, any confusion about Agent Hemberg's earlier testimony regarding "that was it" is clearly clarified by his testimony the next day.

The defense next argues that Agent Hemberg's testimony falsely implied that defendant Ajayi demonstrated a consciousness of guilt to federal agents. Again, defendants have not specifically identified anything that Agent Hemberg stated that was inaccurate. Neither party disputes that defendant Ajayi said "Oh god." Agent Hemberg did not testify that he believed this statement showed her consciousness of guilt. The government did not even seek a jury instruction

that defendant Ajayi's statement could be construed as consciousness of guilt. During cross-examination defense counsel asked questions that elicited information from Agent Hemberg showing that the interview was unscheduled and early in the morning, so early in fact that she may have been in her bathrobe. *See* Trial Tr. Vol. 2B (May 13, 2025) at 152:23. The defense's questions to Agent Hemberg and some of his answers certainly implied that this statement may not have been indicative of defendant Ajayi's consciousness of guilt. Whether this statement showed her consciousness of guilt was a question to be considered by the jury during deliberations.

Notably defendant Ajayi's trial counsel did not object to Agent Hemberg's testimony on the grounds that Agent Hemberg improperly commented on defendant Ajayi's right to remain silent. Thus, this issue must be reviewed for plain error. However, no error – plain or otherwise - occurred as Agent Hemberg never testified that defendant Ajayi chose not to speak with investigators later or that she invoked her right to counsel. Defense counsel's arguments that Agent Hemberg's testimony violated defendant Ajayi's Fifth Amendment rights are completely misplaced. The cases cited by the defense involved the witnesses commenting on the defendant's refusal to answer questions. That did not occur here. Simply put, these cases are simply not applicable to the facts of this case.

**VII.    The Court Did Not Err in Refusing to Sever Defendant Ajayi and Defendant Ogunwale's Trials and did Give a Limiting Instruction at Trial.**

Defendant Ajayi contends that she was prejudiced by the introduction of evidence about Damilola Adeoye at trial, and that the Court failed to give an appropriate limiting instruction regarding this evidence. However, this argument must also fail as the Court did give a limiting instruction.

20

Before trial, the Court correctly denied the defendants' motion to sever the trial. The Court's ruling was in keeping with Fourth Circuit precedent that "generally adhere[s] to the principle that defendants indicted together should be tried together, and a defendant must show that he was prejudiced by the denial of a severance motion in order to establish that the district court abused its broad discretion in that regard. *United States v. Cannady*, 924 F.3d 94, 102 (4th Cir. 2019) (cleaned up). "Demonstrating prejudice is a high hurdle. It exists 'only if there is a risk that a joint trial would comprise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence.'" *United States v. Young*, 989 F.3d 253, 266 (4th Cir. 2021) (citing *United States v. Lighty*, 616 F.3d 321, 348 (4th Cir. 2010) (internal citations omitted).

As the defense noted the Court did give an instruction regarding evidence admitted for a limited purpose. *See* Trial Tr. Vol. 4A (May 15, 2025) at 81:1-7. As the Court well knows, limiting instructions can often act to cure any risk of prejudice. *Zafiro v. United States*, 506 U.S. 534, 537 (1993)). The Court gave the limiting instruction that the defendants requested in connection with the government in the Joint Proposed Jury Instructions. ECF 87 at 25 (Joint Proposed Instruction No. 18 "Evidence Admitted for a Limited Purpose Only."). Thus, any error with the jury instruction was invited by the defense, as this was the instruction that the defense asked the Court to give. The Court should decline to consider this invited error. *See Naum*, 134 F.4th at 239.

If the Court does not wish to invoke the invited error doctrine, the fact remains that trial counsel failed to object to the language of his limiting instruction during the trial and the language of this jury instruction should be reviewed for plain error. *United States v. Alvarado*, 816 F.3d 242, 248 (4th Cir. 2016). To prevail on a plain-error standard, "a defendant has the burden of showing

(1) error, (2) that was plain, and (3) that the error affected his substantial rights." *Greer v. United States,* 141 S. Ct. 2090, 2096-97 (2021). As this Court is well aware, "[s]atisfying all four prongs of the plain-error test 'is difficult.'" *Id.* at 2097. Moreover, "a jury instruction error will only warrant reversal if it is prejudicial based on a review of the record as a whole." *United States v. Jenkins*, Case No. 21-4204, WL 5426733, at *2 (4th Cir. 2023) (citing *United States v. Coby*, 65 F.4th 707, 711 (4th Cir. 2023). Defendant Ajayi has not demonstrated that any errors within the limiting instruction – if there were any – affected her substantial rights. Thus, the Court may dismiss this argument raised by the defendants.

Even if the Court were to completely discount the limiting instruction that was given without objection, it should be noted that trial counsel also failed to request a limiting instruction for defendant Ajayi. A prior Fourth Circuit, *United States v. Hayden*, has dealt with this same issue. *See* 85 F.3d 153, 160 (4th Cir. 1996). In *Hayden*, the defendants had previously moved for severance as the government had noticed its intent to present certain evidence against one of the defendants, James, that another defendant, Lucas, argued would severely prejudice him (Lucas). The government noted the curative effect of limiting instructions when arguing against severance in *Hayden.* The *Hayden* trial court ultimately did not give any limiting instructions as Lucas' counsel never requested any. The *Hayden* court found that the failure to give a limiting instruction in that situation did not constitute a *per se* reversible error as to the judge's refusal to sever the trial. Instead, the Fourth Circuit held that the "ultimate inquiry is whether the trial 'comprise[d] a specific trial right of . . . the defendant[], or prevent[ed] the jury from making a reliable judgment about guilt or innocence.'" *Hayden*, 85 F.3d at 160 (quoting *Zafiro*, 506 U.S. at 537). Substantial evidence was presented at trial of defendant Ajayi's guilt, including the testimony of at least three

current employees of The Non-Profit who testified that they did not work with defendant Ajayi on the tasks that she reported working in the invoices. The United States also presented numerous emails which showed a pattern of defendant Ogunwale forwarding defendant Ajayi the same invoices that defendant Ajayi would then send to The Non-Profit, claiming that she had performed the work detailed in the invoice. Thus, the evidence against both defendants was strong and the Cout's decision not to sever the trials did not prevent the jury from making a reliable judgment regarding the guilt or innocence of either defendant.

**VIII.  Bank Records Obtained by a Valid Subpoena were Introduced at Trial Pursuant to Existing Supreme Court Precedent.**

The defense attempts to relitigate its pretrial motion that defendant Ajayi's bank records, obtained by the government through lawful grand jury subpoenas, were obtained in violation of her Fourth Amendment. The United States reincorporates its response as detailed in ECF 48. The Court has already ruled on this issue and the defense has not presented any new facts to change the Court's original ruling. ECF 63. Supreme Court case, *United States v. Miller*, is still the controlling precedent on the issue. Moreover, "[t]here was no search because this case involved a straightforward application of *Smith* and *Miller*. Just like in those cases, [the defendant] volunteered incriminating information about himself to a third party." *United States v. Chatrie*, 136 F.4th 100 (Mem.) (4th Cir. 2025) (Wilkinson, J., concurring). In doing so, she took the risk that in revealing her affairs to the bank that the information would be conveyed by the bank to others, including the Government. *Miller*, 425 U.S. at 443. (Stating, "[t]his Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the

third party will not be betrayed.")

The defense's assertion that the bank records "revealed Ms. Ajayi's location, to a specific address from August 2016 until August 2021" is also a misleading characterization of the location information contained within the bank records. While these records can show defendant Ajayi's location only when she used a bank card to make certain purchases on certain days, they do not show "precise records of someone's movements" or defendant Ajayi's path of travel minute by minute. Individuals may go days without using their bank cards to make purchases. Bank records simply do not provide nearly the breadth or sheer amount of location information that one obtains from a geofence warrant, cell tower data, or arial surveillance (which are the sources of the location information discussed in the cases cited by the defense). Thus, geofence warrants, cell towers and aerial surveillance are inapt comparisons to the bank records at issue. The location information provided by bank records is much less fulsome than even the rudimentary beeper information that the Supreme Court allowed in *Knotts. United States v. Knotts*, 460 U.S. 276, 282 (1983). In short, any location information provided by bank records falls far short of the constant surveillance standard discussed in *Carpenter v. United States*, 585 U.S. 296, 312 (2018). Moreover, the information turned over in bank records is meaningfully disclosed to a third-party unlike the data at issue in *Carpenter. See id.* at 311, 314-25. Thus, *Miller* rather than *Carpenter* is the controlling authority regarding the admission of the bank records.

Defense argues that the introduction of these bank records was prejudicial against defendant Ajayi. However, whether relevant evidence is prejudicial is not the standard for excluding relevant evidence. Instead, Rule 403 clearly states that relevant evidence may be excluded "if its probative value is substantially outweighed by dangers of . . . unfair prejudice."

24

Defendant Ajayi's bank records were highly relevant to the charged financial offenses. Not only were the bank records vital for showing the financial transactions, but they also provided context to the offenses. The Fourth Circuit has recognized that "allowing the admission of contemporaneous evidence relevant both to the context and to the crime is not the type of prejudice that Federal Rule of Evidence 403 addresses." *United States v. Dunford*, 148 F.3d 385, 396 (4th Cir. 1998). Moreover, the information within the bank records can hardly be described as unfairly prejudicial and this is not the type of evidence that the 403 is designed to exclude.

Therefore, the Court did not err in admitting the validly obtained bank records at trial.

## IX.  There was Significant Evidence of Defendant Ogunwale's and Defendant Ajayi's Guilt and Any Errors that Occurred Were Not Prejudicial.

Defendant Ajayi was found guilty based on the overwhelming evidence against her. Defendant Ogunwale hired defendant Ajayi. Trial Tr. Vol. 1 (May 12, 2025) at 158-159. The government introduced defendant Ajayi's invoices submitted to The Non-Profit. Ex. 100.[5] Every single one of those invoices was initially sent to her by defendant Ogunwale. Trial Tr. Vol. 3 (May 14, 2025) at 121, 163-164. As her hiring manager, defendant Ogunwale approved the invoices submitted by defendant Ajayi. Trial Tr. Vol. 1 (May 12, 2025) at 166, 171-178. For some of the funds paid to Defendant Ajayi, she kicked back a portion to defendant Ogunwale, through various means, including paying his credit card. Exhibit 520-7, 520-10, 520-12. Steve Neri, Laura Brye, and Wondwossen Asefa did not know defendant Ajayi and should have known her based on the work purportedly done by her as detailed in her invoices. Trial Tr. Vol. 2A (May 13, 2025) at 137-

---

[5] The exhibits admitted at trial are attached to this response as Exhibit I (trial exhibits). Within Exhibit I, the trial exhibits are separated by their exhibit number which was used at trial. The response will cite the trial exhibits with their exhibit numbers, such as Ex. 100.

138; Trial Tr. Vol. 2B (May 13, 2025) at 19, 131-132, 134-143; Trial Tr. Vol. 3 (May 14, 2025) 29-38, 40. Indeed for some of the invoices submitted, Brye and Asefa did the work claimed or Neri, Brye or Asefa explained who did the work or why a Project Hope employee would have done the work.[6] Trial Tr. Vol. 2B (May 13, 2025) 29-49, 134-143; Trial Tr. Vol. 3 (May 14, 2025) 29-38, 40. Neri, Brye and Asefa did not work with defendant Ajayi on the projects for which they had personal knowledge. *Id.* For the projects that had checklists, she was not listed on the checklists that corresponded to the invoices. Consultants were brought in for specific knowledge, often technical knowledge, that was needed for a specific project. Trial Tr. Vol. 2B (May 13, 2025) at 15. They were often "subject matter experts." *Id.* at 131. The subject matters that defendant Ajayi purportedly worked on covered a diverse set of countries and work, which did not make sense for one person to have the skills to do so. *See* Trial Tr. Vol. 2B (May 13, 2025) at 49-50. Additionally, she submitted invoices to be paid through PayPal via expense reimbursements submitted The Non-Profit. Ex. 300-2; 520-3. Consultants were not to be paid via expense reimbursement. Trial Tr. Vol. 1 (May 12, 2025) at 229-231; Trial Tr. Vol. 2B (May 13, 2025) at 57-58. Again, a portion of these funds were kicked back to defendant Ogunwale too. 520-11. This is a summary of just some of the overwhelming amount of evidence against the defendants, additional evidence was also presented at trial.

---

[6] For instance, Laura Brye explained that a compliance review which was listed on one of defendant Ajayi's invoices wasn't done for one of the projects. *See* Trial Tr. Vol. 2B (May 13, 2025) 135-137. Laura Brye also testified that another item listed on one of defendant Ajayi's invoices, "the technical volume for compliance," was work would have been done by an employee of The Non-Profit. *Id.* at 138-139.

WHEREFORE, for the foregoing reasons, the United States respectfully requests that the defendant's motion for a new trial be denied.

Respectfully submitted,

Erik S. Siebert
United States Attorney

Date:  July 25, 2025          By:  _____/s/_____
                                   Kathleen E. Robeson
                                   Kimberly M. Shartar
                                   Assistant United States Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 25, 2025, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send a notification of filing ("NEF") to counsel

of record for the defense.

By:           /s/

Kathleen E. Robeson
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: kathleen.robeson@usdoj.gov
