**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 1:24-cr-165-MSN |
| | : | |
| ABIODUN OGUNWALE and | | |
| ABIMBOLA AJAYI, | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' REPLY TO THE GOVERNMENT'S RESPONSE TO THEIR MOTION FOR A NEW TRIAL

The defendants, Abimbola Ajayi and Abiodun Ogunwale, hereby reply to the government's Response, ECF No. 196, to their Motion for New Trial, ECF No. 190.

### ADDITIONAL EVIDENCE

While preparing this brief, defendants have identified probable false evidence in the discovery materials. Purported employment evaluations of Mr. Ogunwale by Project HOPE, dated 2016 and earlier, refer to Chris Skopec and Julia Soyars. *See* Ex. 10, Ogunwale Performance Reviews.[1] Public documentation shows that neither of these persons was employed by Project HOPE until the end of 2016. *See* Ex. 11, LinkedIn profiles of Mr. Skopec and Ms. Soyars.[2] Mr. Ogunwale has also represented as much to undersigned counsel.[3] This inconsistency suggests that those documents were manufactured after the fact.

---

[1]    US-00000016, US-00000019, US-00000022, US-00000026, US-00000028, US-00000029, US-00000031, US-00000036, US-00000039, US-00000042, US-00000044, US-00000045, US-00000055, US-00000068, US-00000081.

[2]    These profiles can be found online at https://www.linkedin.com/in/julia-soyars-8601508/ and https://www.linkedin.com/in/chris-skopec-1940552b/ (last visited July 31, 2025).

[3]    Should the government dispute this point, the defense requests leave to introduce emails from Mr. Ogunwale's account, which support our position.

This suspicion further undermines the honesty and integrity of Project HOPE. Given that most evidence and testimony was derived from Project HOPE, that would arguably warrant a new trial in itself. At the least, however, it further supports the argument that Project HOPE's discovery noncompliance warrants a new trial.

Defendants apologize for their failure to recognize this issue in time to raise it in their initial motion. If the government would like to address the issue in a sur-reply, defendants will not oppose such a request.

## ARGUMENT

The government argues that this Court should not grant the outcome that defendants seek on appeal. Defendants' motion was not an appeal, however, and the nature of the Court's analysis is fundamentally different from appellate review. Those differences warrant a different outcome.

When the government does address the merits, it downplays—or even ignores—the dishonesty of Project HOPE that undermined defendants' ability to prepare for trial. It invents procedural obstacles to blame defendants for their own unfair convictions. And it overlooks the exculpatory evidence that rendered this case far closer than the government now contends.

Because of these flaws in the government's arguments, the interest of justice requires a new trial.

### I. THE COURT HAS BROAD DISCRETION TO GRANT A NEW TRIAL IF JUSTICE REQUIRES IT. WHETHER THE COURT PREVIOUSLY ERRED SHOULD NOT BE RELEVANT TO ITS DECISION.

The government frequently argues that this Court did not abuse its discretion or commit plain error. On appeal, such arguments might be appropriate. On a motion for new trial, however, they are irrelevant. Defendants do not have to show, and have not even argued, that the Court committed reversible error. Rather, they must show that "the interest of justice" requires a new trial. Fed. R. Crim. P. 33(a). Similarly, because it is irrelevant whether the Court is "convicted of

error," the doctrine of invited error does not foreclose the grant of a new trial. *United States v. Naum*, 134 F.4th 234, 239 (4th Cir. 2025) (quoting *United States v. Herrera*, 23 F.3d 74, 75 (4th Cir. 1994)) (analyzing doctrine in the context of direct appellate review of conviction), *petition for cert. filed*, No. 25-5117 (July 15, 2025); *see United States v. Elfenbein*, — F.4th —, 2025 WL 1967611, at *1, *12 (4th Cir. July 17, 2025) (affirming grant of new trial precisely because the evidence necessary to sustain defendant's conviction was introduced by defense witnesses); Mot. for New Trial at 13–14 (citing cases in which defendant failed to object to, or even acquiesced in, the evidence or jury instruction). Such requirements would needlessly constrain the Court's broad discretion. *See generally United States v. Rafiekian*, 68 F.4th 177, 187 (4th Cir. 2023) (*Rafiekian* II).

There is a good reason for these differences. A district court, which conducted the trial, may be sensitive to injustices that would escape the restrictive analysis on appeal. If so, the Court rightly has the power to correct such injustices, even when it did not make a mistake warranting reversal. This power supplements appellate courts' narrower authority to correct legal error, much as the doctrine of equity supplements the more rigid law. Indeed, for most of American history, that power was virtually unlimited. *See Rafiekian* II, 68 F.4th at 187. Although orders granting a new trial can now be reversed by a higher court, "nothing about that amendment [permitting appeals] suggests that it was intended to significantly curb the district court's historically unreviewable discretion in ordering new trials." *Ibid.* (quoting *United States v. Wolff*, 892 F.2d 75, 1989 WL 152513, at *8 (4th Cir. Dec. 12, 1989)).

In arguing for a narrower standard of review, the government cites numerous appellate court decisions affirming the denial of a speedy trial motion. That a court had the discretion to deny a speedy trial motion, however, does not always—or even usually—mean that it had no

discretion to grant the motion. *See Rafiekian* II, 68 F.4th at 187. Neither does the government contend that any of these cases are factually similar in any respect.[4] Although the government does cite a single reversal of a new trial, which is likewise inapposite,[5] the Fourth Circuit later affirmed the grant of a new trial when the district court provided more fulsome reasoning. *See United States v. Rafiekian*, 991 F.3d 529 (4th Cir. 2021) (*Rafiekian* I); *Rafiekian* II, 68 F.4th 177.

It also makes many assertions that are questionable or, in some cases, downright wrong. The government has no precedential support for its statement that "a new trial is a drastic remedy intended for the rare case." Response at 4 (citing an unpublished case); *see Bender v. Elmore & Throop, P.C.*, 963 F.3d 403, 407 n.1 (4th Cir. 2020) ("[B]ecause those opinions are unpublished, they do not have precedential effect and we do not address them here."); 4th Cir. L. R. 32.1 ("Citation of this Court's unpublished dispositions issued prior to January 1, 2007, in briefs . . . in the district courts within this Circuit is disfavored, except for the purpose of establishing res

---

[4]    The closest cases were resolved at least partially on the basis of curative instructions. *See United States v. Burfoot*, 899 F.3d 326, 341 (4th Cir. 2018) (affirming denial of new trial, in part because "the district court properly mitigated any potential effects of [the challenged] statement by instructing the jury to disregard it"); *United States v. Chong Lam*, 677 F.3d at 204 ("[w]e find that the district court did not abuse its discretion by concluding that its curative instructions were sufficient to ensure Appellants were afforded a fair trial."). Here, the only relevant curative instruction is one that was *not* given. *See _. United States v. Williams*, which addressed possible biases of a witness, is completely inapposite. 613 F.2d 573 (5th Cir. 1980). The remaining decisions address only the grant of a new trial based on evidence purportedly discovered after trial, or on challenges to the weight of evidence, neither of which is at issue. *See Geders*, 625 F.2d at 32 ("This motion was also based on new evidence . . . ."); *United States v. Chin*, 181 F.3d 92, 1999 WL 333137, at *2 (4th Cir. 1999) (unpublished table opinion) (addressing argument that a witness' "lack of credibility fatally undermines the government's case"); *United States v. Arrington*, 757 F.2d 1484, 1486 (4th Cir. 1985) (affirming denial of new trial, despite judge's disagreement with the verdict, when the defendant attacked the credibility of a witness); *United States v. Gibson*, 559 F.2d 934, 935 (4th Cir. 1977) ("After exhausting direct appellate remedies, Gibson (now incarcerated in Federal prison) filed motions for a new trial on grounds of newly discovered evidence . . . .").

[5]    The only relevant issue is the purportedly inadequate limitations on hearsay evidence, 991 F.3d at 550-51, which is addressed below. Section VI, *infra*.

judicata, estoppel, or the law of the case."). Its support for placing the burden on the defense is an out-of-circuit decision addressing totally inapposite facts, which is expressly limited to evidence discovered after trial (and, in that case, after the denial of a previous motion for new trial). *See United States v. Geders*, 625 F.2d 31, 33 (5th Cir. 1980) ("When a prosecution is fairly conducted and undertaken in good faith, and the only problem arises from newly discovered evidence, the burden of justifying a new trial is fairly placed upon the defendant."). More broadly, while the government argues that new trials should be rare, the Fourth Circuit has recently clarified that "[d]istrict courts should grant new trials *based on the weight of the evidence* only in rare instances." *Rafiekian II*, 68 F.4th at 186 (emphasis added) (quotation omitted).

## II.    PROJECT HOPE'S DISHONESTY AND NONCOMPLIANCE SABOTAGED DEFENDANTS' ABILITY TO PREPARE FOR TRIAL.

The government all but admits that Ms. Brye testified, in open court, that Project HOPE had kept more proposals than it had turned over—in violation of a subpoena. It tries, but fails, to defend Project Hope's general dishonesty and hostility to defendants' requests, while admitting that the defense relied on Project HOPE's representations and record-keeping. This trend raises doubts about the integrity of the evidence that was produced. It also shows that defendants were unable to make effective or informed preparations for trial.

### A.    Project HOPE Admitted That It Refused to Provide All the Proposals in Its Possession, Despite Being Ordered to Do So. Defendants Are Entitled to a New Trial, at Which They May Present All the Evidence to Which They Should Have Access.

Project HOPE refused to comply with the subpoena for proposals resulting from defendants' pre-positioning work. Laura Brye testified to as much. The government now argues that Ms. Brye's testimony is consistent with Project HOPE's claims to have complied with the subpoena—and also, somehow, that Ms. Brye didn't actually say what she plainly said. These incoherent arguments make no sense in isolation and even less when fitted together.

First, the government argues that Ms. Brye did not expressly testify that Project HOPE had refused to turn over proposals that it maintained.[6] But Ms. Brye testified that Project HOPE had not searched for all thirty proposals, but only a subset. Trial Tr. Vol. 2B (May 13, 2025) at 160:22 – 161:3, ECF No. 176. She also testified that Project HOPE kept the proposals "[m]ost of the time" that it was the subrecipient. Response at 8 (quoting testimony of Ms. Brye). It is therefore very unlikely that Project HOPE would not have kept fully half of the requested proposals.

Perhaps recognizing these problems, the government also speculates that Ms. Brye might somehow have meant something other than what she said (or might just have been wrong). The government does not have the prerogative to rewrite (or ignore) trial testimony, any more than the defense may do the same to the jury verdict. Ms. Brye was very clear: the shared drive had "all of the proposals." Trial Tr. Vol. 2B at 154:18-23; *see also id.* at 155:9 – 156:3 (shared drive contained "the proposals for which [Project HOPE was] only the subrecipient").

There is no ambiguity in Ms. Brye's testimony. Project HOPE kept far more proposals than it turned over, and did not even look for all that were requested. It deliberately failed to comply with a subpoena. This clear defiance of a court order warrants a new trial.

---

[6]    The government also argues that the questioning of Ms. Brye "inappropriately verged into The Non-Profit's counsel's directions to The Non-Profit employees . . . which is protected by attorney-client privilege." Response at 8. It is not entirely clear that an attorney's instructions are privileged, particularly where those instructions have already been disclosed, and where they are given to comply with—or, as the case may well be, to defy—a legal duty. *See generally Nat'l Labor Relations Bd. v. Interbake Foods, LLC*, 637 F.3d 492, 501-02 (4th Cir. 2011) (quoting *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982)) (stating elements of attorney-client privilege); *United States v. Moazzeni*, 906 F. Supp. 2d 505, 511-12 (E.D. Va. 2012) (describing exception to privilege for unlawful activity); *Republican Pty. of N.C. v. Martin*, 136 F.R.D. 421, 426 (E.D.N.C. 1991) ("The privilege does not apply to legal advice which could not arguably reveal a client's confidences."). In any case, there was no privilege objection at trial.

**B. Project HOPE Also Admitted That It Could Have Satisfied Defendants'
Informal Requests, Even Though It Previously Claimed to Have Made Its
Best Efforts to Do So.**

It was already apparent that Project Hope's informal productions had significant

deficiencies. Mot. for New Trial at 5–6. Moreover, the anachronisms in the purported employment

file indicate deliberate fraud. At trial, however, it became undeniable that Project HOPE had not

even attempted to comply with defendants' requests. Mr. Neri's testimony that the pre-positioning

documents were shared and easily accessible may not demonstrate that Project HOPE failed to

comply with the subpoena, but certainly demonstrates that Project HOPE chose not to turn over

documents that the defense needed and had requested. In other words, it proves what defendants

had repeatedly argued: that Project HOPE was deliberately not complying with discovery requests,

and that a subpoena was necessary to compel it to do so.

The government's attempts to blame Mr. Ogunwale for failing to request pre-positioning

documents is unfounded.[7] Mr. Ogunwale repeatedly moved for a subpoena to compel production

of these documents. *See* Def.'s Fourth Motion for a Subpoena Duces Tecum, ECF No. 126, at 2

(requesting "[a]ll pre-positioning documents from 2014 to 2020 which are presently Project

Hope's possession"); Mot. for Issuance of a Subpoena Duces Tecum, ECF No. 30, Request No.4

("Records of all [p]re-positioning activities, including invoices and work hours performed by

consultants or contractors, handled by A. Ogunwale during his time at Project Hope."). Even as to

the motion that was partially granted—which maintained Mr. Ogunwale's "objection to the denial

of his previously litigated motion for issuance of a subpoena to Project Hope"—that motion

---

[7]    The government's related claim that any discovery deficiencies are "invited error" is
absurd. The government assumes that any deficiencies must be due to shoddy recordkeeping,
rather than deliberate noncompliance, and then speculates that this was somehow Mr. Ogunwale's
fault. And an email that Mr. Oguwnale would "be in the office" is far from establishing that
Mr. Ogunwale cleaned out – or knew that he was expected to clean out – the filing cabinet in
question.

requested numerous materials intended to "aid the defense in establishing that Project Hope . . . was aware of and authorized, directly and indirectly, Mr. Ogunwale's pre-positioning work . . . ." Second Mot. for Issuance of a Subpoena Duces Tecum, ECF No. 67, ¶¶ 1, 2. Thus, Mr. Ogunwale requested a copy of his employment file, which would show that defendants' "work led to the award of numerous contracts which allowed Project Hope to provide aid to many thousands of people [in] Africa." *Id.* at 3 n.2; *see also* Request No. 1 ("The entire employment file of A. Ogunwale."). Mr. Ogunwale also requested copies of "[a]ny and all records related to grants or funding applications submitted by Project HOPE that involved A. Ogunwale." *Id.*, Request No. 6. Mr. Ogunwale later expanded his request to include the contents of his filing cabinet, "in which he kept extensive documents concerning his pre-positioning work," and the contents of his laptop. Addendum to Second Mot. for Rule 17 Subpoena to Project HOPE, ECF No. 70, at 1.

Finally, the government reiterates its prior arguments that the records were not relevant to the charges. It is true that the Court has previously found that such documents were not sufficiently relevant. That, however, is why the Court enjoys such latitude to order a new trial. After witnessing defendants' inability to prove their work without any records of it, the Court should reconsider its prior conclusion and hold that defendants are entitled to a new trial, with the benefit of a subpoena to enforce its requests.

### C. Defendants Were Misled into Requesting a Stipulation, Depriving Them of the Ability to Properly Form Their Trial Strategy.

The defense accepts the government's representation that it did not intentionally withhold materials from the defense, and did not know that Project HOPE was doing so.[8] Nevertheless, the fact remains that the defense was misled by Project HOPE into entering a stipulation based on

---

[8]    The defense also accepts the government's explanation for its beliefs as to venue.

false premises. The government admits that both parties relied on what they were told by Project HOPE. Motion at 11 ("The government, and presumably the defense, relied on these representations by the general counsel."). They did indeed, and what they were told was false. Defendants should have been permitted to formulate that strategy without deception. Similarly, the defense cannot be said to have invited this outcome, because the defendants cannot have invited another to deceive them.

The government also argues that the stipulation was not false. Of course, if Project HOPE had turned over all that it was required to, defendants might not have had to enter a stipulation at all. They might have chosen to bring out Project HOPE's recordkeeping practices through witnesses at trial, whom they had secured as witnesses for that very purposes. *See* Subpoenas to Testify, ECF No. 144. They might also have chosen to stipulate to something substantially different. But, even if they had chosen to enter into a stipulation to the effect that these proposals may not have been preserved, they likely would have chosen different phrasing. Whatever its formal meaning, "not necessarily" is often used in an entirely different context. It may be used to soften an unpleasant sentence, for understatement, or for no reason at all.[9] The jury may well have understood the stipulation as asserting that the proposals were not preserved, or were preserved

---

[9]    The following are some examples taken from the Collins and Merriam-Webster dictionaries. Examples of 'Not Necessarily' in a Sentence, Collins, https://www.collinsdictionary.com/us/sentences/english/not-necessarily (last visited July 31, 2025); *How to Use* Not Necessarily *in a Sentence,* Merriam-Webster, https://www.merriam-webster.com/sentences/not%20necessarily (last updated July 22, 2025). "That's not necessarily the norm: bookings often are handled entirely through texts and emails, and that's the way many clients like it." "The Pacific Northwest was full of great bands in the early '90s, but Boise, Id., was not necessarily on anybody's radar as the next hot music scene." "The out-of-the-box vanilla ChatGPT would not necessarily have done that kind of pattern matching." "That's not necessarily meant as a criticism." "Not necessarily love but just how we are all working together." "That may not necessarily be the best mode of conversation in your circles." "Not necessarily ugly, just a bit out of place."

only on rare occasions, despite already knowing that Project HOPE kept most such proposals. This contradiction would assuredly undermine defendants' credibility, which is especially important when defendants are charged with fraud.

### D. Defendants Need an Evidentiary Hearing to Verify the Government's Representations as to its *Brady* Obligations.

The government contends that it did not fail to disclose anything and, if it did, the defense cannot prove that the withheld information is material. The defense is unable to challenge this point, and we therefore reiterate our requests for an evidentiary hearing so that we can. *See* Ms. Ajayi's Reply in Support of Her Mot. to Compel Disclosure of *Brady* and Jencks Material, ECF No. 191.

### III. DEFENDANTS TIMELY REQUESTED LEAVE TO TRAVEL, WHICH WAS NECESSARY TO OBTAIN DOCUMENTS AND WITNESSES FOR THEIR DEFENSE.

The government cannot blame defendants for waiting "until the eve of trial" to track down financial information. Motion at 14. Mr. Ogunwale first sought leave to travel in early February, and renewed his motion at the end of February, almost three months before trial. *See* Second Motion to Modify Bond to Allow Permission to Travel Internationally Secured by Home Equity, ECF No. 68; Mot. for Foreign Travel, ECF No. 61. In fact, Ms. Ajayi sought to travel even earlier, and was also prohibited from doing so. *See* Motion to Travel, ECF No. 26; Order, ECF No. 28.

The evidence is uncontradicted that Mr. Ogunwale had to travel to Nigeria if he was to obtain bank records. The government's Exhibit G shows that the website of a Nigerian bank today purports to offer online banking, but does not demonstrate that any such service would permit access to the bank records at issue, which were from several years earlier. Against that lack of evidence, there is specific trial testimony that Nigerian bank records from before 2021 can only be obtained in person. Trial Tr. Vol. 4A (May 15, 2025) at 59:14 – 60:11, ECF No. 181. Even the

government was not able to obtain records from a Nigerian bank. Trial Tr. Vol. 3 (May 14, 2025) at 207:25 – 208:2, ECF No. 177.

As for the remaining evidence, counsel for Mr. Ogunwale tried to explain to the Court that local custom requires personal, face-to-face contact. Motions Proceedings Tr. (Mar. 27, 2025) at 34:5-22, ECF No. 173; Motion/Arraignment Tr. (Feb. 6, 2025) at 62:18 – 63:9, ECF No. 172. Attorneys and investigators are not trusted in Nigeria as they are in the United States. Phone calls and emails are not sufficiently personal for such an important, and often unwelcome, request. This reality was demonstrated at trial, when the defendants were able to introduce only a single witness.

## IV.    THE COURT SHOULD NOT HAVE LIMITED MS. FASOLA'S TESTIMONY, WHICH WAS APPROPRIATE EXPERT TESTIMONY THAT WAS ADEQUATELY DISCLOSED UNDER TRYING CIRCUMSTANCES, AND MUCH OF WHICH WAS EXCLUDED AS HEARSAY DESPITE BEING BASED ON PERSONAL KNOWLEDGE.

The government argues that the Court did not err, let alone abuse its discretion, in denying Ms. Fasola permission to testify as an expert witness. The defense repeats that it need not demonstrate any error or abuse of discretion, but only that the interest of justice requires a new trial. *See* Section I, *supra*.

The government contends that Ms. Fasola's expert testimony should have been denied as untimely. The government, however, does not contend that it needed more time to obtain an expert. The only asserted prejudice is that the government might not have been able to prepare for a timely *Daubert* motion. Clearly, given the outcome, it was perfectly able to do so. Furthermore, the government already knew that defendants intended to "present expert testimony on the topic of 'diaspora commerce.'" Def.'s Expert Designation, ECF No. 109. Even before that, it knew that the defense intended to offer the testimony of Ms. Fasola—"a former government official and businesswoman in Nigeria"—that the supposed kickbacks were actually informal debt repayments and money transfers. Mot. to Continue Trial Date ¶ 6, ECF No. 99. The government had known

since the second arraignment that defendants planned to introduce evidence of loans, remittances, and other aspects of Nigerian financial culture. *See* Motion/Arraignment Tr. at 63:10-24. The defense has offered a good-faith explanation for its late notice of Ms. Fasola, *i.e.*, it did not know that she would be available to testify. *See* Motion to Withdraw Video Testimony of Oladayo Tinuola Fasola, ECF No. 134; Ex. 12, Email from Chris Leibig to Kimberly Shartar *et al.* (May 6, 2025). Under such circumstances, courts frequently permit the introduction of expert testimony. *See United States v. Kessler*, 926 F.3d 490, 491-92 (8th Cir. 2019) (affirming recess instead of exclusion, even when government's disclosure was mid-trial, because defendant knew the expected topic and had opportunity to question witness); *United States v. McLean*, 715 F.3d 129, 142-43 (4th Cir. 2013) (when defendant had failed to clarify inadequate disclosures by trial, court permitted *voir dire* of expert rather than excluding testimony); *United States v. Melucci*, 888 F.2d 200, 203 (1st Cir. 1989) (affirming admission of expert testimony that government disclosed four days before it was delivered, because defendant already knew the subject matter was at issue); *United States v. Martin*, No. 4:14CR17, 2014 WL 3058514, at *1-2 (E.D. Va. June 6, 2014) (admitting expert testimony that government disclosed four business days before trial because defendant could not identify prejudice, government had provided good-faith explanation, and testimony was very limited).

Attached to the notice were an affidavit and biography of Ms. Fasola. These described her work conducting money transfers for Nigerians and her opinions about legitimate reasons that Nigerians would transfer money to one another. This disclosure, even if "somewhat lean," was sufficient. *United States v. Phillips*, 146 F. Supp. 3d 837, 842 (E.D. Mich. 2015) (finding summary of witness' opinion and professional experience sufficient), *aff'd*, 677 F. App'x 294 (6th Cir. 2017); *see United States v. Szczerba*, 897 F.3d 929, 939 (8th Cir. 2018) (finding CV and summary

of opinion sufficient); *United States v. Jiang*, Crim. No.  No. 1:24-cr-65 (RDA), 2025 WL 641430, at *3 (E.D. Va. Feb. 7, 2025) (defense satisfied Rule 16 by providing "a statement of the opinions that will be elicited from [the expert], the bases and reasons for those opinions, [his] qualifications, and other cases in which [he] has testified as an expert"); *United States v. McGee*, No. 22-CR-019-JFH, 2024 WL 217848, at *9 (E.D. Okla. Jan. 19, 2024) (government satisfied disclosure requirements by providing CV of expert and notice that she would "testify to all aspects of her knowledge in the [subject matter at issue] based upon her education, background, training, and experience," with a few specific examples). Ms. Fasola's professional experience permitted expert testimony. Mot. for New Trial at 12; *see also United States v. Esformes*, 60 F.4th 621, 637 (11th Cir.) (allowing for "less formal" methods under *Daubert* where expert testifies based on experience), *cert. denied*, 144 S. Ct. 485 (2023). And the disclosure adequately revealed that experience.

The government asserts, in passing, that all of Ms. Fasola's excluded testimony was hearsay. That is not true. For example, counsel was not permitted to inquire "[d]id there ever come a time when [Mr. Ogunwale] would ask [Ms. Fasola]" something. Trial Tr. Vol. 4A at 38:18. The following words could have described a request, a question that Ms. Fasola could answer from personal knowledge, or something that was relevant to Ms. Fasola's state of mind. Yet, counsel could not even finish the question. Neither was Ms. Fasola permitted to explain why she had made payments to someone else. *Id.* at 39:7-12. Her apparent answer would have involved a direction from Mr. Ogunwale, but the nature of that direction would be within her own knowledge, and the direction itself would not necessarily contain hearsay. These constant interruptions must, at least, have rattled the nerves of a witness at a criminal trial in a foreign country, and risked suggesting to the jury that defendants were trying to sneak in forbidden evidence.

V.    **ALTHOUGH THE DENIAL OF A CONTINUANCE WAS NOT UNJUST IN ITSELF, THE COURT SHOULD NOT HAVE DENIED NECESSARY MOTIONS FOR FEAR OF DELAYING THE TRIAL.**

The government misunderstands defendants' theory. We do not argue that any denial of a continuance was wrong or harmful in itself. Rather, we argue that the foregoing motions were denied because to grant them would risk delaying the trial date. It was the denial of those motions that caused injustice warranting a new trial.

Nevertheless, defendants reiterate that we need not show any abuse of discretion, only that the interest of justice requires a new trial. *See* Section I, *supra*; *see also United States v. LaRouche*, 896 F.2d 815, 823-24 (4th Cir. 1990) (reviewing conviction on direct appeal); *United States v. Badwan*, 624 F.2d 1228, 1229-31 (4th Cir. 1980) (same). Lest the Court think that these procedurally inapposite cases demonstrate an appropriate time frame, defense counsel in *LaRouche* had been familiar with the charges for over two years before the indictment, and *Badwan* involved significantly less evidence. *See LaRouche*, 896 F.2d at 820, 822, 824 (counsel were familiar with charges against defendant from prior indictment, issued more than two years before the indictment at issue on appeal, which defendants contended—at arraignment, in a 98-page comparison—were similar enough to warrant transfer); *Badwan*, 624 F.2d at 1231 ("Of the nine tax returns on which the prosecutions were based, six were the individual returns of the Badwans."). It also bears mention that defense counsel in neither case strenuously objected, as did defense counsel here. *Compare LaRouche*, 896 F.2d at 822, 824 n.1 (at arraignment, "[d]efense counsel expressed no concerns that the trial would come too soon," and a change in circumstances necessitating more time was not presented to the district court), *and Badwan*, 624 F.2d at 1230-31 (defense counsel was silent at arraignment and first moved for continuance two weeks before trial), *with* Joint Mot. to Continue Trial Date, ECF No. 59 (moving for a continuance based on imminent

superseding indictment), *and* Mot. to Continue Trial Date, ECF No. 99 (describing significant unanticipated events that warranted an additional continuance).

## VI.    WITHOUT A LIMITING INSTRUCTION, THE JURY WRONGLY CONSIDERED THE EVIDENCE OF MR. ADEOYE'S GUILT AGAINST MS. AJAYI.

The government argues—three times, in three different ways—that Ms. Ajayi may not object to the lack of limiting instruction because she did not properly do so during trial. A motion for new trial, however, is not an appeal. *See* Section I, *supra*. Frankly, Ms. Ajayi's trial counsel should have sought a limiting instruction, but his failure to do so does not preclude a new trial. *See United States v. Knight*, 800 F.3d 491, 512 (8th Cir. 2015) (affirming grant of new trial on basis of defective jury instruction, even where instruction was in line with the parties' submissions[10]); *United States v. Jennings*, 438 F. Supp. 2d 637, 642 (E.D. Va. 2006) (new trial could be granted based on jury instruction, despite defendant's failure to object at trial), *aff'd*, 496 F.3d 344 (4th Cir. 2007)); *see also Elfenbein*, 2025 WL 1967611, at *12 (affirming grant of new trial based on decisions of defense counsel).

On the merits, the government contends that a limiting instruction was given. That limiting instruction, however, was never tied to the evidence concerning Mr. Adeoye. The government does not cite, and defendants are not aware of, any statement that such evidence was introduced for a limited purpose. Indeed, at trial, the government itself suggested that this could present an issue. *See* Trial Tr. Vol. 3 (May 14, 2025) at 280:16-18. This case is thus entirely different from *Rafiekian* I, where "the court clearly instructed the jury as to that limited purpose—both at the time the statements were admitted, and again before deliberation." 991 F.3d at 550.

---

[10]    "While the instruction given was in line with the parties' submissions and with the Eighth Circuit Model Jury Instructions, the Court does not believe that the instruction was entirely correct in this case. . . . [T]he Court finds that this instruction, in the context of this case, was clearly erroneous, and such error alone would warrant the granting of a new trial on this Count." *Knight*, 25 F. Supp. 3d 1104, 1160 (W.D. Ark. 2014), *aff'd in relevant part*, 800 F.3d 491 (8th Cir. 2015).

Given that lack of limitations, a juror could only have understood the instructions as permitting the evidence regarding Mr. Adeoye to be considered against Ms. Ajayi. Mot. for New Trial at 20 (citing Trial Tr. Vol. 4A at 104:6 – 105:12). Furthermore, the government repeatedly conflated the evidence involving Mr. Adeoye with evidence involving Ms. Ajayi, or invoked that evidence against Ms. Ajayi.[11] This case is thus very different from those in which the absence of a limiting instruction was found tolerable. *Cf. Rafiekian* I, 991 F.3d at 550 (government used the challenged hearsay evidence only for permissible hearsay purposes); *United States v. Hayden*, 85 F.3d 153, 161 (4th Cir. 1996) ("[T]he case was not so complex that the jury could not separate the evidence as to each defendant. For those reasons, we find that a jury could have made an individual determination as to [appellant's] guilt and that any 'spill-over' effect . . . did not prejudice [appellant].")

## VII. AGENT HEMBERG'S TESTIMONY, ALTHOUGH NOT NECESSARILY PERJURIOUS, MAY HAVE MISLED THE JURY INTO BELIEVING THAT MS. AJAYI HAD EVINCED CONSCIOUSNESS OF GUILT.

The government argues at length that Agent Hemberg did not commit perjury. But Agent Hemberg is not on trial for perjury. Just as the defense is not required to show reversible error, it is not required to convict a witness of perjury, but only to demonstrate that the testimony "creates

---

[11] *See* Mot. for New Trial at 18, 20 (quoting examples); Trial Tr. Vol. 4B (May 15, 2025) at 14:10-11 (jurors "can see through the evidence" relating to Ms. Ajayi and Mr. Adeoye "that a broader pattern has emerged"), ECF No. 178; *id.* at 54:8-10 ("why is Defendant Ogunwale treating Defendant Ajayi and Defendant [*sic*] Adeoye differently than these other consultants?" (alteration in original)); *id.* at 55:5-6 (analyzing "the invoices submitted by Mr. Adeoye and Ms. Ajayi"); *see also* Trial Tr. Vol. 1 at 118:7-13 ("The evidence will also show that they embezzled in another way. . . . The evidence will show that there's a consultant by the name of Damilola Adeoye."), ECF No. 179; *id.* at 121:24 – 122:9 (describing how Ms. Ajayi and Mr. Adeoye purportedly transferred funds to Mr. Ogunwale); *id.* at 122:10-21 (arguing that evidence would show that Project HOPE staff did not know Ms. Ajayi or Mr. Adeoye); Trial Tr. Vol. 2A at 60:12 – 62:3 (testimony of Anthony Tredon) (offering similar testimony as to Ms. Ajayi and Mr. Adeoye), ECF No. 180; Trial Tr. Vol. 2B at 19:1-3 ("Q. Now, are you familiar with an individual by the name of Ambibola Ajayi or Damilola Adeoye? A. No, I'm not.").

a false impression of facts which are known not to be true." *Juniper v. Davis*, 74 F.4th 196, 21 (4th Cir. 2023) (quoting *Burr v. Jackson*, 19 F.4th 395, 410 (4th Cir. 2021)). Thus, what matters is not whether Agent Hemberg intended to deceive, but whether it was false and the prosecution knew as much. *See ibid.* (requiring "a showing of the (1) falsity and (2) materiality of testimony and (3) the prosecutor's knowledge of its falsity") (quoting *Basden v. Lee*, 290 F.3d 602, 614 (4th Cir. 2002)); *see also Geders*, 625 F.2d at 33 (when the government introduces false testimony, and knew or should have known of the falsehood, then "a new trial must be held if there was any reasonable likelihood that the false testimony would have affected the judgment of the jury"). The prosecution certainly knew that Ms. Ajayi had spoken to Agent Hemberg that afternoon. An implied admission of guilt would be material to a typical juror.[12]

That leaves falsity. In isolation, the government again wishes ambiguity onto unambiguous testimony. Agent Hemberg was asked if he had ever attempted to interview Ms. Ajayi. He described an unsuccessful attempt to do so, stated "that was it," and then moved on to other subjects. A juror could only infer that this testimony described the sum total of his attempts to interview Ms. Ajayi.

The government asserts, however, that any falsehood was prevented by Agent Hemberg's testimony the following day. After considerable unrelated testimony, cross examination, redirect examination, and even Agent Hemberg stepping down and the government resting its case, Agent

---

[12]    The government's insinuations that this did not show consciousness of guilt, followed by an assertion that the jury could consider her consciousness of guilt, are rather confusing. That Agent Hemberg never expressly declared Ajayi's consciousness of guilt does not negate that the government presented half-truths to imply as much. Its assertion that some questions and responses did not suggest consciousness of guilt is so vague as to be meaningless. Most importantly, Agent Hemberg never stated that she might have been in her bathrobe, but only that he could not recall. Trial Tr. Vol. 3 at 231:3-6. The comments and questions by defense counsel were not evidence. Years later, it is unsurprising that Agent Hemberg did not recall what she was wearing.

Hemberg did eventually describe the follow-up interview. *See* Trial Tr. Vol. 4A at 11:3-22. A far more natural flow would have been for that testimony immediately to follow the account of the earlier attempt. And the government's apparent desire to omit this information, or at least to maintain a false impression in jurors' minds, does not suggest probity. The jury may well have failed to understand that Agent Hemberg was talking about the same day.[13] So severe a misunderstanding would call for a new trial.

## VIII.  INTRODUCTION OF BANK RECORDS SHOWING MS. AJAYI'S LOCATION VIOLATED THE FOURTH AMENDMENT, WHICH MANDATES EXCLUSION REGARDLESS OF HOW PROBATIVE THEY ARE.

The government does not cite to a single controlling decision that the third-party doctrine applies to location data.[14] *See* Response at 23–25; Resp. in Opp'n to Defs.' Mot. to Suppress Financial Records, ECF No. 48. It simply assumes as much, although this assumption is unsupported by any legal authority. *See* Mot. for New Trial at 23. The government argues that *Miller* must apply, because the information in bank records is "meaningfully disclosed to a third-party," Response at 24, but that begs the question. Engagement in commercial transactions, which "is indispensable to modern society," is not a conscious sharing of information as is depositing checks or money at the bank itself. *Carpenter v. United States*, 585 U.S. 296, 315 (2018). And "*Smith* and *Miller* . . . did not rely solely on the act of sharing," but also considered the documents'

---

[13]    In all honesty, undersigned counsel for Ms. Ajayi failed to understand this, despite reading through the entire transcript and reading most of it at least twice. If trained lawyers with the benefit of deliberate reading could not connect the two, that connection might well have been lost on jurors in the heat of trial.

[14]    *United States v. Chatrie*, 136 F.4th 100 (4th Cir. 2025) (mem.) (en banc) would be controlling on similar facts. The concurring opinion that the government cites is not. Defendants maintain that the concurrences by Judges Wynn and Berner, which carefully analyze the effect of recent Supreme Court decisions on Fourth Amendment case law, are persuasive authority that demonstrate the merit of their position. *See* Mot. for New Trial at 22–24.

lack of "revealing nature." *Id.* at 314. The Fourth Amendment shows "special solicitude for location information in the third-party context." *Ibid.*

The government argues that the location data reveals nothing, comparing the location data to the beeper seen as permissible in *United States v. Knotts*. 460 U.S. 276 (1983). Extending *Knotts* would be unwise, given that the Supreme Court itself considered that *Knotts* might warrant reconsideration if surveillance became more pervasive. *Id.* at 284 ("[I]f such dragnet type law enforcement practices as respondent envisions should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable."). Since then, "when confronted with more pervasive tracking, five Justices agreed that longer term GPS monitoring of even a vehicle traveling on public streets constitutes a search." *Carpenter*, 585 U.S. at 314-15 (citing *United States v. Jones*, 565 U.S. 400, 430 (2012) (Alito, J., concurring in judgment); *id.* at 415 (Sotomayor, J., concurring)). Moreover, *Knotts* addressed contemporaneous tracking of a single journey. Such limited surveillance does not present a "chronicle of a person's physical presence compiled every day . . . over several years." *Carpenter*, 585 U.S. at 315. Neither is it retroactive. *See* Mot. for New Trial at 22 (citing multiple cases addressing the significance of retroactivity).

Because these records were obtained in violation of the Fourth Amendment, they could not be introduced at trial, regardless of whether they were more probative than they were prejudicial.

## IX. EVERY INFERENCE OF THE DEFENDANTS' GUILT WAS CONTRADICTED BY EXCULPATORY EVIDENCE OR ADMISSIONS. THEREFORE, THE UNFAIR TRIAL PREJUDICED THE DEFENDANTS.

The government finally argues that, even if the above might have been unfair, it doesn't matter because the defendants were guilty. Yet, there is significant evidence that they were not. The most damning evidence that the government cites was undermined, if not outright contradicted, by defense counsel at trial.

Mr. Ogunwale hired Ms. Ajayi—but not without authorization to do so. Trial Tr. Vol. 1 (May 12, 2025) at 197:11 – 198:5, ECF No. 179; Trial Tr. Vol. 2A (May 13, 2025) at 126:14-22, ECF No. 180. Ms. Ajayi's invoices were sent to her by Mr. Ogunwale—because they worked closely together, and these invoices reflected their discussion. *See* Trial Tr. Vol. 1 at 204:22 – 205:7; Trial Tr. Vol. 2A at 36:23 – 37:11; *id.* at 125:16-22, 127:1-13; Trial Tr. Vol. 2B at 116:1-11; *id.* at 164:14-25; Trial Tr. Vol. 3 (May 14, 2025) at 51:2-17, 68:3-17, 215:3-11, 217:11-19; Trial Tr. Vol. 4B (May 15, 2025) at 27:24–28:10, ECF No. 178. She sent some of her payments back to him— and sometimes he paid her, as the two repaid debts and avoided bank exchange fees. Trial Tr. Vol. 4A (May 15, 2025) at 32:20 – 33:16, 34:8-9, 39:2-8, 40:8-17, 41:4-21, 42:9-14. Some Project HOPE staff did not know her—again, because she worked directly with Mr. Ogunwale. Anthony Tredon, who worked with Mr. Ogunwale, did know her—and knew that she performed work for Project HOPE. Trial Tr. Vol. 2A at 125:23 – 126:9. She was not on staff checklists—because she solely performed pre-positioning work. Trial Tr. Vol. 2A at 91:1 – 92:6, 125:6-12. Ms. Ajayi was not paid through regular channels—but perhaps those channels weren't as regular as they were supposed to be. *See* Trial Tr. Vol. 1 at 249:19-21, 250:13-17; Trial Tr. Vol. 2A at 38:16-23.

Taking all of this into account, a jury could infer that the inaccurate task descriptions on invoices were no more than shoddy paperwork: not ideal, perhaps, but certainly not fraud.

## CONCLUSION

A reasonable jury at a fair trial might well have acquitted the defendants. The Court should give one the opportunity to do so by ordering a new trial.

Respectfully submitted,

By: */s/ Eugene V. Gorokhov*
Eugene Gorokhov, Va. Bar No. 73582
*Attorney for defendant Abimbola Ajayi*
BURNHAM & GOROKHOV, PLLC
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

By: */s/ Christopher Leibig*
Christopher Leibig, Va. Bar No. 40594
Law Offices of Christopher Leibig
421 King Street #505
Alexandria, VA 22314
(703) 683-4310 (phone)
(703) 574-1497 (fax)
Chris@chrisleibiglaw.com

## CERTIFICATE OF SERVICE

On August 1, 2025, a copy of the foregoing Reply was filed with the Clerk of Court via

ECF, which automatically sends a copy to all counsel of record.


By: */s/ Eugene V. Gorokhov*
Eugene Gorokhov, Va. Bar No. 73582
*Attorney for defendant Abimbola Ajayi*
BURNHAM & GOROKHOV, PLLC
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com